UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ACADEMY ORTHOTIC &
PROSTHETIC ASSOCIATES IPA, INC.
and ACADACARE, LLC,

                               Plaintiffs,

            -v-

FITANGO HEALTH, INC., DOV
BIRAN, and CHRISTINA VORVIS,

                               Defendants.

19-CV-10203 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

      This case arises out of actions undertaken by Defendants Fitango Health, Inc., Dov Biran, and Christina Vorvis to protect their intellectual property rights in software developed for Plaintiffs Academy Orthotic & Prosthetic Associates IPA, Inc. and Acadacare, LLC.  Plaintiffs claim that Defendants, by sending cease-and-desist letters and making negative comments about Plaintiffs to Plaintiffs' business associates, (1) defamed them, (2) tortiously interfered with their prospective business relations, and (3) breached the express terms of, as well as the implied covenant of good faith and fair dealing in, the software-development contract between Plaintiffs and Defendants.  Plaintiffs claim (4) that they are entitled to declaratory relief to establish that their conduct did not infringe on Defendants' copyrights.  Separate from the dispute about Defendants' cease-and-desist letters and negative comments, Plaintiffs claim (5) that Defendants breached their software-development contract and the implied covenant by failing to develop the agreed-upon software and by overbilling.

      Defendants now move to dismiss the Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons that follow, Defendant's motion is granted in part and denied in part.

1

**I.     Background**

Academy is an independent practice association that works with healthcare insurers to arrange the delivery of durable medical equipment ("DME"), such as wheelchairs and oxygen tanks, to healthcare providers. Acadacare is a medical management company that handles billing and authorizations for Academy. (Dkt. No. 19 at 4.)

**A.     Acadacare's Contract with Fitango**

On May 1, 2017, Acadacare entered into a contract with Fitango for the development and subsequent licensing of a digital medical management platform. (Dkt. No. 19 at 5–6.) Under the contract, Fitango would develop claims-processing software meeting certain specifications, test the platform, and train Acadacare personnel on use of the platform. (Dkt. No. 19-1 at 3.) In exchange, Acadacare would pay Fitango $30,000 preceding and during the development of the platform. (Dkt. No. 19-1 at 12.) Acadacare would then pay a monthly fee of $4,000, and an additional $0.25 for each claim in excess of 10,000 claims, to license the platform. (Dkt. No. 19-1 at 11–12.) Throughout, Fitango would "retain the ownership of all right, title and interest in and to" the platform and "all patents, copyrights and other proprietary rights therein." (Dkt. No. 19-1 at 9.) Although the contract specified that it was a "5-year contract," either party could "stop the agreement with a 3 months (90 days) notice." (Dkt. No. 19-1 at 12.)

Fitango developed a usable platform for Acadacare, but Acadacare felt that the platform failed to meet the specifications set forth in the contract. (Dkt. No. 19 at 6.) Furthermore, Acadacare experienced technical difficulties with the platform and suffered "losses of approximately $200,000 due to lost or incorrectly filed claims" within six months of the platform's launch. (Dkt. No. 19 at 7.) In March 2019, Acadacare approached Fitango about "develop[ing] the program with the features . . . originally requested back in 2017," as well as several additional features that Acadacare had since determined were necessary for a "top-notch"

platform. (*Id.*) Fitango estimated that it would cost $500,000 to develop the requested platform and offered to perform the work in exchange for an increase in Acadacare's monthly fee to $10,000 and a 20% interest in Academy. (*Id.*)

Acadacare was skeptical that developing the appropriate software would cost $500,000, and in May 2019 approached smartData, Enterprises Ltd. ("smartData") for an alternative quote. (Dkt. No. 19 at 8.) To assist smartData in preparing its quote, Acadacare gave smartData user log-in information for Fitango's platform. (*Id.*) This allowed smartData to "view the current platform and assess its general functionality." (*Id.*) It did not allow smartData to view the underlying code. (*Id.*) smartData estimated that developing a new platform with Acadacare's requested features would cost between $45,000 and $60,000. (Dkt. No. 19 at 9.) Acadacare began working with smartData, and on May 23, 2019, forwarded smartData an email that it had earlier sent to Fitango. (Dkt. No. 19-2 at 2.) The email outlined "upgrades to the system that [Acadacare] would like implemented" in "Fitango v.2.0." (*Id.*) In the body of the email, Acadacare specified that the list of upgrades "should not be used as a template as it pertains to our 'current' system" but that the list would "provide additional insights on what we do and what we need." (*Id.*) smartData responded to Acadacare's email the same day, informing Acadacare that smartData was "going through [Fitango's] existing system" and that smartData was soon going to "finalize application screens and modules" for a new platform. (Dkt. No. 19-2 at 1.)

On September 4, 2019, Acadacare inadvertently forwarded the May 23, 2019 emails to Fitango. (Dkt. No. 19-2 at 1.) On September 23, 2019, Fitango's counsel sent Academy a cease-and-desist letter stating that "Fitango has reason to believe that [Acadacare is] planning to create or creating [its] own DME system based on the platform [it] licensed from Fitango" and that "it would violate both the [May 2017] Agreement and applicable law for [Acadacare] to use

that platform as the building block of [its] own system." (Dkt. No. 19-5 at 1.) The letter asked Academy to confirm that neither it nor Acadacare would "attempt[] to develop [its] own DME system by modifying or building upon Fitango's DME system." (*Id*.) The letter stated that, in the absence of such confirmation, Fitango "will conclude that [Acadacare] plan[s] to continue breaching the Agreement and infringing on Fitango's rights." (Dkt. No. 19-5 at 2.)

Counsel for Acadacare responded on September 25, 2019. Their letter stated that Acadacare was "not in any way violating the agreement" or "any applicable law." (Dkt. No. 19-6 at 1.) The letter's conclusion was ostensibly based on the facts that the Fitango platform was the product of "Acadacare's extensive investment of time and resources" and that Fitango has no "proprietary interest or intellectual property rights in DME systems generally." (*Id*.) The letter did not deny Fitango's accusation that Acadacare was basing its new platform on Fitango's work or otherwise using Fitango's work as a building block. Separate from the letter, Acadacare informed Fitango that it "had not yet developed another program." (Dkt. No. 19 at 11.)

**B.     Fitango's Statements to Third Parties**

Following the exchange in September, Fitango sent a series of letters to Acadacare's business partners to inform them of its belief that Acadacare was infringing Fitango's copyrights. First, on October 16, 2019, Fitango sent a cease-and-desist letter to smartData. The letter asserted that smartData had "improperly access[ed] the DME platform for the purpose [of] building a competing one." (Dkt. No. 19-7 at 1.) Then, on October 22, 2019, Fitango sent a letter to GTT, an entity that was contemplating buying Academy and that Fitango purportedly had "reason to believe" was providing funds that Acadacare was using to pay smartData. (Dkt. No. 19-8 at 1.) The letter informed GTT that, "[i]n the event Academy IPA is indeed a wholly owned subsidiary of GTT, [Fitango] believe[s] that GTT is fully responsible for any IP infringement and any other claim . . . against Academy IPA and Acadacare." (*Id*.) The letter

4

asked GTT to confirm that it "will not assist Acadacare, directly or indirectly, in infringing Fitango's copyright-protected intellectual property in the DME platform." (*Id.*) Fitango sent a third letter, on October 31, 2019, to VillageCare, an entity that was negotiating a contract to use Academy's services. (Dkt. No. 19 at 11.) The letter stated that Fitango was "in favor of an agreement . . . that incorporates its copyright protected intellectual property, but only if it is included in the discussions and can provide its informed consent." (Dkt. No. 19-17 at 1.) It stated Fitango's belief that "Academy has been infringing Fitango's intellectual property rights in violation of their written agreement dated May of 2017." (*Id.*)

In addition to claiming that Academy and Acadacare were infringing its copyrights, Fitango informed VillageCare and GTT that Acadacare had submitted an improper security assessment to VillageCare to obtain its business. (Dkt. No. 19 at 12; Dkt. No. 19-17 at 1.) Before entering into an agreement with Acadacare, VillageCare had requested a security assessment of its claims-management platform — at the time, the Fitango platform. (Dkt. No. 19 at 11.) Instead of submitting a security assessment of the Fitango platform, Acadacare submitted a security assessment of the platform smartData was developing. (Dkt. No. 19 at 12.) Potentially at the direction of Defendant Dov Biran, Fitango's CEO, a Fitango employee reached out to VillageCare to inform it that Acadacare's security assessment was "misleading." (Dkt. No. 19 at 12.) Later, Fitango's October 31, 2019 letter to VillageCare described that the security assessment was "submitted without prior authorization or approval from Fitango" and sought information on whether VillageCare had rejected the assessment. (Dkt. No. 19-17 at 1.) Fitango's October 22, 2019 letter to GTT also discussed the security assessment. Believing that GTT had influence on "discussions with VillageCare," Fitango informed GTT "that Acadacare ha[d] not disclosed to VillageCare that it intends to change, or has changed, the Fitango DME

5

platform" and "that Acadacare provided a misleading security assessment to VillageCare without input from Fitango." (Dkt. No. 19-8 at 1.)

Finally, Defendant Christina Vorvis, Fitango's COO, made two statements about Academy to a manager at McKesson Medical, a supplier of medical equipment that was contemplating partnering with and investing in Academy. (Dkt. No. 19 at 13.) In those statements, Vorvis described Academy as "about to go under" and "defunct." (*Id*.) She also stated that the VillageCare negotiations would fail. (*Id*.) Vorvis urged McKesson Medical to bypass Academy and work with Fitango directly. (*Id*.)

In the wake of Fitango's letters and statements, smartData, VillageCare, GTT, and McKesson Medical stopped working or negotiating with Acadacare and Academy. smartData paused its development of Acadacare's new platform "until the . . . issues raised by Fitango's counsel in the October 16, 2019 letter are resolved." (Dkt. No. 19 at 14.) VillageCare, which on October 2, 2019, had represented to Acadacare that it would circulate a contract on October 7, 2019, decided against doing so in the intervening time. (Dkt. No. 19 at 12.) VillageCare made clear that its decision was based on Acadacare's deficient security assessment. (*Id*.) GTT's negotiations with Academy came to a "standstill," which GTT confirmed was the result of the litigation, or prospect of litigation, with Fitango. (Dkt. No. 19 at 15.) And the McKesson Medical partnership "has . . . not gone forward." (Dkt. No. 19 at 13.)

The letters and statements to third parties prompted Plaintiffs to file suit in New York state court on November 1, 2019. (*See* Dkt. No. 5-1.) Plaintiffs brought claims for defamation, tortious interference, breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory judgment. (*Id*.) Defendants removed the case to federal court on

6

November 4, 2019.  (*See* Dkt. No. 1.)  One month later, on December 6, 2019, Defendants moved to dismiss Plaintiffs' claims.  (*See* Dkt. No. 17.)

### C.     Fitango's Invoices to Acadacare

In late October 2019, Fitango demanded that Acadacare pay $21,212 for its past use of Fitango's platform.  (Dkt. No. 19 at 15.)  The total reflected a fee of $1.00 for each claim processed on the platform.  (Dkt. No. 19 at 16.)  Fitango threatened that it would exercise its right to terminate the licensing agreement with Acadacare, thereby terminating Acadacare's access to the platform, if payment was not promptly made.  (Dkt. No. 19 at 15.)  Acadacare objected to the invoice but "paid the inflated invoices under duress and protest" because it would otherwise have no access to any claims-processing platform.  (Dkt. No. 19 at 16.)  In November 2019, after Plaintiffs had filed suit in New York state court, Fitango demanded that Acadacare pay $7,442 for its use of the platform, again calculating the invoice by charging $1.00 for each claim.  (Dkt. No. 19-12 at 2.)  Acadacare lodged its opposition to the invoice but still paid the requested amount.  (Dkt. No. 19 at 17.)  In December 2019, Fitango sent two more invoices that together charged Acadacare $13,828.  (*Id.*)  Acadacare paid the invoices but informed Fitango that it would raise Fitango's improper billing practices with the Court.  (*Id.*)

On December 20, 2019, Plaintiffs filed an amended complaint that added a breach-of-contract claim and an implied-covenant claim against Fitango, with respect to the billing practices.  (Dkt. No. 19 at 23–24.)

## II.    Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In considering the motion to dismiss, the Court "must accept as true all of the factual allegations

contained in the complaint." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002). And while "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678, the Court must draw "all inferences in the light most favorable to the non-moving party[]," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

## III. Discussion

Plaintiffs claim that, through the alleged conduct, Defendants defamed them and tortiously interfered with their potential business relations; breached the May 2017 contract and the implied covenant of good faith and fair dealing; and entitled them to declaratory relief. Defendants contest each of Plaintiffs' claims. The claims are considered in turn.

### A. The Defamation and Tortious Interference Claims

Under New York law, the elements of a defamation claim are "[1] a false statement, [2] published without privilege or authorization to a third party, [3] constituting fault as judged by, at a minimum, a negligence standard" that "[4] either cause[s] special harm or constitute[s] defamation per se." *Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (1st Dep't 1999). And to state a claim for tortious interference with prospective economic relations, "the plaintiff must allege that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (internal quotation marks and citation omitted). With respect to the third element, "as a general rule, the defendant's conduct must amount to a crime or an independent tort." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004).

Plaintiffs identify three classes of statements in their defamation claims: Fitango's statements about Acadacare's infringement on Fitango's copyrights; Fitango's and Dov Biran's statements about Acadacare's security assessment for VillageCare; and Christina Vorvis's statements about Academy's financial health and likelihood of landing the VillageCare contract. They identify the same statements in their tortious interference claims, arguing that the statements' defamatory nature satisfies the third element of their tortious interference claims. (Dkt. No. 26 at 17.)  Because Plaintiffs do not identify another basis on which the statements may be criminal or tortious, the success of Plaintiffs' tortious interference claims is predicated on the success of their defamation claims.  To the extent Plaintiffs' defamation claims fail, so too must their tortious interference claims.

          **1.**       **The Statements about Infringement**

Defendants argue that none of their statements about Plaintiffs' supposed infringement of their copyrights were defamatory because their statements were privileged as "statements made by an attorney on behalf of his or her client in connection with prospective litigation." *Front, Inc. v. Khalil*, 24 N.Y.3d 713, 718 (2015).  Such privilege and concomitant immunity from liability for defamation attach to "statements pertinent to a good faith anticipated litigation." *Id.* at 720.  The privilege, however, "does not protect [parties] who are seeking to bully, harass, or intimidate their . . . adversaries by threatening baseless litigation or by asserting wholly unmeritorious claims, unsupported in law and fact." *Id.*

Plaintiffs contend that Defendants "could not possibly have in good faith believed in the merits of a copyright infringement claim," given that Defendants "had not seen a product to compare to their own" at the time they sent the October 2019 letters.  (Dkt. No. 26 at 18.) Plaintiffs set a high bar for when a copyright-holder may in good faith send a cease-and-desist letter.  And that bar is inconsistent with previous case law.  For instance, in *Lombardo v. Dr.*

9

*Seuss Enterprises*, a district court concluded that the "defendant had a good faith basis for sending . . . cease-and-desist letters based on the publicly available information about [a] [p]lay," even though the defendant had not yet seen the play or read its script. No. 16-cv-9974, 2017 WL 1378413, at *2, *8 (S.D.N.Y. Apr. 7, 2017). The pertinent analysis for determining whether the privilege applies is not whether the defendant "ultimately prevails on the [infringement] issue" but rather whether, in light of the information available to the defendant at the time, the defendant could have reasonably believed that it had a claim. *Id*. at *8.

For Defendants, the available information at the time the letters were sent was the May 23, 2019 email exchange between Acadacare and smartData. From this email exchange, Defendants could infer that Acadacare had retained smartData to develop a new platform and had given smartData access to the Fitango platform. Although Acadacare's email cautioned smartData not to use Acadacare's request for upgrades to the Fitango platform "as a template," Defendants easily could have understood this to mean that smartData was not to hew to the request's minutiae or "order of importance . . . for each change/addition." (Dkt. No. 19-2 at 2.) Defendants' September 23, 2019 cease-and-desist letter to Academy, which well preceded any of Defendants' letters to third parties, evidences that Defendants in fact inferred from the email exchange that smartData was using the Fitango platform "as the building block of [the new] system." (Dkt. No. 19-5 at 1.) The September 23, 2019 letter invited Plaintiffs to refute Defendants' understanding that Plaintiffs were developing their "own DME system by modifying or building upon Fitango's DME system." (*Id*.) In their September 25, 2019 response, Plaintiffs did not provide such a refutation (*see* Dkt. No. 19-6 at 1), allowing Defendants to maintain their good faith, if mistaken, belief that smartData was copying Fitango's platform, not creating a completely different platform.

10

It is in this context that Defendants sent the letters to smartData, VillageCare, and GTT. All three entities, creators or prospective licensors of the supposedly infringing software, were appropriate recipients of Defendants' letters, based on the information available to Defendants in October 2019.  Accordingly, Defendants' statements about Plaintiffs' infringement were privileged, and Plaintiffs' defamation claim with respect to these statements fails.  Because Plaintiffs' defamation claim on this issue fails, so too does their related tortious interference claim.

### 2.    The Statements about the Security Assessment

Defendants argue that Plaintiffs have inadequately pleaded their defamation claim regarding Defendants' statements about the security assessment Acadacare prepared for VillageCare.  (Dkt. No. 23 at 8–9).  Specifically, Defendants highlight that New York Civil Practice Law and Rules § 3016(a) requires that a complaint allege "the particular words" giving rise to the plaintiff's defamation claim.  (*Id*.)  Section 3016(a), however, does not set forth the pleading standard applicable in federal court.  Instead, "the mode of pleading defamation is governed by Rule 8" of the Federal Rules of Civil Procedure, under which "the standards for sufficiency of the pleadings are liberal."  *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986) (citation omitted).  So long as the Complaint affords Defendants "sufficient notice of the communications complained of to enable [them] to defend [themselves]," the claim is adequately pleaded — even if Plaintiffs "failed to aver the specific aforementioned statement[s]."  *Id*. (citation omitted).

The Complaint provides Defendants sufficient notice of the challenged statements.  Two of Defendants' statements about the security assessment, which Defendant made via the October 2019 letters to VillageCare and GTT, are included verbatim in the Complaint and its exhibits. The Complaint also alleges that a Fitango employee, at the instruction of Dov Biran, made a

11

similar statement to VillageCare some time between Wednesday, October 2, 2019, and the following Monday.  (Dkt. No. 19 at 12.)  Contextualized by Defendants' statements in their October 2019 letters, this allegation is both sufficiently specific and plausible to afford Defendants notice of the communication at issue and to warrant a response.

Defendants argue that, even if the statements were adequately pleaded, Plaintiffs have failed to allege defamation *per se* or special damages as a result of the statements.  (Dkt. No. 23 at 9–11.)  Defendants suggest that for a statement to be defamation *per se*, it must "imply [some]thing nefarious to the business's integrity or competence, *i.e.* by alleging fraud."  (Dkt. No. 23 at 10.)  But the test for identifying defamation *per se* is broader than Defendants let on.  Under New York law, statements are defamatory *per se* "if they . . . imput[e] to [the plaintiff] any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof."  *Gimaldi v. Schillaci*, 484 N.Y.S.2d 159, 729–30 (3d Dep't 1984) (citation and internal quotation marks omitted) (concluding that a letter portraying the plaintiff as "not entirely honest" could "constitute libel per se").  This includes statements that "suggest[] improper performance of one's professional duties or unprofessional conduct." *Frechtman v. Gutterman*, 979 N.Y.S.2d 58, 61 (1st Dep't 2014) (citation omitted).

A jury could find that Defendants' statements about Acadacare's supposedly "misleading" security assessment would implicate Plaintiffs' reputation for honesty and good-faith dealing with business partners.  Similarly, a jury could find that the statements called into question whether Plaintiffs were properly performing their professional duties.  The court in *Angio-Medical Corp. v. Eli Lilly & Co.* held that statements about a plaintiff's supposedly "misleading" or "out of line" conduct could, on a motion to dismiss, sustain a defamation action.  720 F. Supp. 269, 272 (S.D.N.Y. 1989).  As there, the Court holds that Defendant's statements

12

about the security assessment can, at this juncture, sustain the present action. Plaintiffs may pursue their defamation claim regarding Defendants' statements on the security assessment.

### 3. The Statements about Academy's Solvency

Defendants reiterate their argument that Plaintiffs have failed to plead defamation *per se* or special damages with respect to Christina Vorvis's statements about the Academy's solvency. Here, too, the argument falters. Although defamation *per se* typically does not include "remark[s] on [a] business's ability to make a profit or remain in business in a particular field or geographical area," *Kforce, Inc. v. Alden Personnel, Inc.*, 288 F. Supp. 2d 513, 517 (S.D.N.Y. 2003), New York courts have long recognized that "[a] charge of insolvency, bankruptcy or want of credit is actionable per se." *De Seversky v. P.&.S. Pub.*, 34 N.Y.S.2d 284, 285 (Sup. Ct. N.Y. Cnty. 1942). "[A]n absolute negation of the business existence is libelous." *Medina v. United Press Ass'ns*, 185 N.Y.S.2d 366, 368 (Sup. Ct. N.Y. Cnty. 1959); *see also Van-Go Transport Co. v. New York City Bd. of Educ.*, 971 F. Supp. 90, 99 (E.D.N.Y. 1997) ("A statement that a company is insolvent is defamatory"); *Bidonthecity.com LLC v. Halverston Holdings Ltd.*, No. 12-cv-9258, 2014 WL 1331046, at *16 (S.D.N.Y. Mar. 31, 2014) (identifying "a prima facie claim of defamation to overcome dismissal" based on the defendant's statement that plaintiff was "shutting down").

Vorvis stated that Academy was "about to go under" and "defunct." (Dkt. No. 19 at 13.) A jury may find these statements tantamount to a charge of insolvency or an absolute negation of Academy's business existence. Plaintiffs may pursue their defamation claim regarding these statements.

13

### 4. The Business Relations with VillageCare, GTT, and McKesson Medical

In addition to contesting whether Plaintiffs have adequately pleaded defamation as a predicate tort, Defendants contest whether Plaintiffs have adequately pleaded injury for their tortious interference claims. (Dkt. No. 23 at 15–16.) Injury in this context requires Plaintiffs to show "that defendants' actions were both a cause-in-fact of [the] lost business . . . and that the lost business was a foreseeable consesquence of defendants' actions." *SourceOne Dental, Inc. v. Patterson Co., Inc.*, 310 F. Supp. 3d 346, 370 (E.D.N.Y. 2018). Plaintiffs have plainly alleged injury with respect to VillageCare, which itself identified the deficient security assessment, flagged by Defendants, as the reason why it did not issue a contract to Acadacare. Plaintiffs have not alleged injury, flowing from the plausibly tortious statements about the security assessment, with respect to GTT. As pleaded, the GTT negotiations came to a standstill because of the potential litigation over Fitango's copyrights, not because of Plaintiffs' security assessment.

Plaintiffs' pleadings with respect to their relationship with McKesson Medical are less complete. Still, they are more fulsome than the injuries that courts have previously identified as insufficient "vague speculation of harm." *Goldman v. Reddington*, 417 F. Supp. 3d 163, 177 (E.D.N.Y. 2019) ("[T]he vague statement that [the plaintiff] is 'nervous' [about repercussions] does not allege any concrete harm"). To illustrate, the injury alleged in *Oxyn Telecommunications v. Onse Telecom* was "too vague and speculative" to support a tortious interference claim because the plaintiff's potential investors "had conditioned the possibility that they might invest" in plaintiff's business, and the defendant in fact had "neither contacted, nor directed any actions, toward" the investors. No. 01-cv-1012, 2003 WL 22271224, at *6 (S.D.N.Y. Sept. 30, 2003). In that circumstance, it would pile inference on inference to say that

14

the defendant's conduct was the but-for and proximate cause of the plaintiff's failure to secure investments.  Here, in contrast, Academy's negotiations with McKesson Medical stalled after Christina Vorvis made negative comments about Academy directly to McKesson Medical personnel and urged those personnel to "deal directly with Fitango," rather than Academy.  (Dkt. No. 19 at 13.)  At the pleading stage, the Court reasonably infers that such statements could be the but-for and proximate cause of the stalled negotiations.

Plaintiffs may pursue their tortious interference claims regarding the lost business relations with VillageCare and McKesson Medical.

### B. The Breach-of-Contract and Implied-Covenant Claims

Plaintiffs bring three pairs of breach-of-contract and implied-covenant claims.  In the first, Plaintiffs claim that Fitango breached the May 2017 contract and the implied covenant of good faith and fair dealing "by making false assertions that Acadacare and Academy have infringed the purported intellectual property." (Dkt. No. 19 at 22.)  In the second, Plaintiffs claim that Fitango breached the contract and the implied covenant by "failing to deliver on the product and services described" and preventing Plaintiffs from "seeking other sources for an adequate platform." (*Id.*)  And in the third, Plaintiffs claim that Fitango breached the contract and the implied covenant "by overbilling and threatening to terminate access if its improper invoices . . . are not paid." (Dkt. No. 19 at 23.)

#### 1. The First Breach-of-Contract and Implied-Covenant Claims

Defendants argue that Plaintiffs' first pair of breach-of-contract and implied-covenant claims, regarding Fitango's assertions that Plaintiffs were infringing its copyrights, is preempted under Copyright Act § 301 and must be dismissed.  Section 301 provides that "no person is entitled . . . under the common law or statutes of any State" "to any such right . . . in any such work" as would be protected by the Copyright Act.  17 U.S.C. § 301.  A state claim is preempted

15

when (1) it revolves around a work that "fall[s] within the subject matter of copyright . . . , even if [it] contain[s] material that is uncopyrightable" under the Copyright Act, and (2) the "state law right is equivalent to one of the exclusive rights" in the Copyright Act.  *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 429–30 (2d Cir. 2012) (internal quotation marks and citation omitted).  More simply put, "where the right asserted [in the state claim] hinges essentially on a determination of whether the rights protected by the Copyright Act exist, the [state] claim is preempted."  *Saint-Amour v. Richmond Org., Inc.*, 388 F. Supp. 3d 277, 291 (S.D.N.Y. 2019).

In their first contract claims, Plaintiffs plead that "it is a breach of the covenant and the substantive provisions of the [May 2017] Agreement for Fitango to falsely assert that Acadacare (as agent for Academy) has breached the Agreement by misappropriating the purported intellectual property."  (Dkt. No. 19 at 22–23.)  The claims are contingent on Fitango misapprehending the scope of its copyrights and wrongfully sending cease-and-desist letters.  They "simply reframe[] the single [Copyright Act] question presented in this litigation, that is, whether the Defendants' copyright is valid" and has the scope Defendants believe it has.  *Saint-Amour*, 388 F. Supp. 3d at 291.  Because "preemption cannot be avoided simply by labeling a claim 'breach of contract,'" *Forest Park Pictures*, 683 F.3d at 432, Plaintiffs' first contract claims are foreclosed by § 301.

### 2. The Second and Third Breach-of-Contract and Implied-Covenant Claims

Defendants argue that Plaintiffs' second and third pair of breach-of-contract and implied-covenant claims fail because Plaintiffs have not alleged "that Defendants breached any specific section or obligation of the [May 2017] Agreement."  (Dkt. No. 23 at 18.)  This is patently false.  As relevant, Plaintiffs allege that Fitango breached the specific sections of the

16

contract describing the platform functionalities that Fitango was to develop and describing how Fitango would be compensated for its development and licensing of the platform. (Dkt. No. 19 at 22–23.) Plaintiffs and Fitango never concluded an agreement superseding the May 2017 contract and its compensation provisions. Although Plaintiffs paid a series of invoices in which Fitango charged a higher rate than the rate contemplated by the May 2017 contract, Plaintiffs contemporaneously explained that they were doing so "under protest and while reserving all rights since such amounts are not owed." (Dkt. No. 19-10 at 1.) Plaintiffs' second and third breach-of-contract claims withstand Defendants' challenge.

So too does Plaintiffs' third implied-covenant claim, regarding Fitango's invoices. Under New York law, "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educational Testing Serv.*, 663 N.E.2d 289, 291 (1995) (citation omitted). The implied covenant protects "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Id*. (citation and internal quotation marks omitted). It "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id*. (citation and internal quotation marks omitted). By its own terms, the May 2017 contract is a "5-year contract" that outlines a set method for calculating invoices. (Dkt. No. 19-1 at 12.) Fitango, with its so-called "hard bargaining tactics" (Dkt. No. 23 at 19), has defied any expectation that the explicitly agreed-upon method would be honored across the five-year term. (Dkt. No. 19-1 at 12.) Although the contract nowhere states that its termination provision shall not be abused by one party to extort the other, such an expectation is implicit. Plaintiffs have plausibly pleaded that Fitango violated this implicit expectation.

Plaintiffs' second implied-covenant claim, regarding Fitango's supposed frustration of Plaintiffs' efforts to "seek[] other sources for an adequate platform," is less successful.  (Dkt. No. 19 at 22.)  This claim, like Plaintiffs' preempted contract claims and its infringement-related defamation claims, turns on the scope of Defendants' copyrights and whether Defendants had a good-faith basis to send their cease-and-desist letters.  Having already decided that Defendants had a good-faith basis on which to send their letters, *see supra* Section III.A.1, the Court dismisses this claim.

## C.     The Declaratory Judgment Claim

Finally, Defendants argue that Plaintiffs' declaratory judgment claim must be dismissed because smartData's program has not been published and the claim is therefore unripe.  (Dkt. No. 23 at 22.)  In assessing the ripeness of a claim, courts consider (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration."  *Abbott Labs v. Gardner*, 387 U.S. 136, 149 (1967).

A copyright claim is unfit for review if it is "far from clear" that the work at issue "would infringe the copyrights of any [party]" in the case.  *Authors Guild v. HathiTrust*, 755 F.3d 87, 105 (2d Cir. 2014).  In contrast, a copyright claim is fit for review when "it is abundantly clear that the two parties are on a collision course that has already framed the essential disputes in plain terms and that will enable the Court to determine their respective rights."  *McGraw-Hill Cos. v. Ingenium Tech. Corp.*, 375 F. Supp. 2d 252, 257 (S.D.N.Y. 2005).  Disputes surrounding unpublished works can be sufficiently concrete to render those disputes fit for review.  In *Morgan Art Foundation v. McKenzie*, a dispute surrounding an unpublished catalogue raisonné was deemed ripe for review — even though the exact content of the catalogue was yet unsettled — based on how the allegedly infringing party had compiled materials for the catalogue and the catalogue's imminent publication.  No. 18-cv-4438, 2019 WL 2725625, at *11–12 (S.D.N.Y.

18

July 1, 2019).  Nothing, in principle, distinguishes software from other forms of intellectual property so as to preclude a dispute about software from being concrete prior to the software's publication.

The copyright dispute in this case is clear, as Defendants have sent numerous cease-and-desist letters in response to the development of Plaintiffs' new platform.  Defendants, who have seen mockups of smartData's proposed platform (*see* Dkt. No. 5-4), maintain that the platform, if published, would infringe their copyrights.  In the motion to dismiss, Defendants reiterate that Plaintiffs' act of giving smartData access to the Fitango platform "would be an essential element in [Fitango's] copyright infringement action if the [smartData] software were published."  (Dkt. No. 23 at 23.)  The existence and parameters of the dispute are sufficiently defined.

Furthermore, Plaintiffs will face hardship if the Court does not review their claim.  As a result of Defendants' cease-and-desist letters, Plaintiffs' business partners have refused to work with or invest in Plaintiffs until the copyright matter is resolved.  (*See* Dkt. No. 19 at 12–15.)  Until Plaintiffs can develop a new platform, which Plaintiffs have struggled to do with this matter looming, Plaintiffs must rely on the Fitango platform, a platform with which Plaintiffs have repeatedly expressed their dissatisfaction.  Plaintiffs' claim for declaratory relief is ripe for review.

**IV.    Conclusion**

For the foregoing reasons, Defendant's motion to dismiss the amended complaint (Dkt. No. 22) is GRANTED in part and DENIED in part.  The motions at Docket Numbers 17 and 30 are DENIED as moot.

Defendants shall file answers to the surviving claims within 14 days after the date of this Opinion and Order.

19

The Clerk of Court is directed to close the motions at Docket Numbers 17, 22, and 30.

SO ORDERED.

Dated: October 16, 2020
       New York, New York

_____
J. PAUL OETKEN
United States District Judge